Good morning, Your Honor. Peter Homer and Chris King on behalf of the defendant appellants. We'd like to reserve five minutes for rebuttal on this. This court has five separate reasons to go ahead and reverse the judgment that was here. First, the monetary award here was actually a penalty, which is not equitable relief under Section 13. And if you try to imply such an available remedy under Section 13, really what we're talking about then is a violation of concepts of separation of powers. Don't we have FTC v. Commerce Planet? Yes, sir. And doesn't that foreclose that argument? No, sir, I don't believe so. And the reason for that is, is that under Kokesh, if you look carefully and look at the factors that Kokesh went into in terms of deciding what is a penalty, they are the same type of factors that in the Commercial Planet case had said why they justified that. And if you look carefully at it, what they were talking about there, even if we agreed that Kokesh, which was a securities issue, were well argued, that's insufficient, isn't it, to allow us to overrule our own precedent? So, Your Honor, I expected that you might ask that question here with respect to that. But there are Ninth Circuit opinions which have held under the circumstances where there's an intervening U.S. Supreme Court decision that is applicable. It allows you to go ahead and do that. Guller v. GAMI, which we have applied from time to time. Yes. But you're going to have to persuade us that Kokesh overrules Commerce Planet. Understood, Your Honor. And I'll be happy to walk. And explain around footnote 3. I mean, I sort of see what you're saying. It's a harbinger, perhaps, of something to come. But wasn't the Court very clear in saying we're only deciding this one issue as it applies to a statute of limitations? And as Your Honor knows, the Supreme Court pretty religiously adheres to the issue that they granted certiorari on. And that was the sole issue there. But if you look at the opinion itself in terms of what they spent probably 70, 80 percent of the discussion in there is where disgorgement in those circumstances was in fact a penalty. And this is where the Commerce Planet case comes into play here, that even the Ninth Circuit has recognized that under Section 13 you can't imply penalties under Section 13. That's something you can get that kind of relief under Section 19. So that's, you know, that's what the problem I think is. And what Kokesh did is it laid out a, you know, a format, a test, a series of tests which can be done. And if you put those side by side with the Commerce Planet case, the kinds of factors that they looked at there, it would lead you to the conclusion that the kind of relief that's being done granted here by the trial court and that actually the Ninth Circuit has applied in the past are in fact a penalty. And let me explain to you why that's the case. So really in this circuit more than any other in the country is they've conflated this idea about restitution and disgorgement and put them together. And what they've also said here, if you look carefully at Kokesh, they describe what the roots are of disgorgement. They describe it as a form of restitution. And what they also say there is, and they refer you to the restatement of remedies and restitution like that. And if you look carefully at what is in there, that contemplates that an alleged wrongdoer would be able to reduce their damages, the monetary relief which is being sought against them by expenses that were associated with that. Now the court disagreed with us the first time we were here on that. And a good example of that here would be there would be a direct variable cost, and that's what the restatement talks about, which is the magazines. My clients paid for those. It's had things of value. The consumers here picked those specific magazines and there was a value that was associated with those. If the Ninth Circuit test of how you calculate restitution or disgorgement is here, it is a penalty because it does two things. It doesn't allow for any offsets whatsoever other than for sort of givebacks, chargebacks on something like that. It doesn't allow any other deductions for that. And if you think about it as well, here our original judgment was for $193,000. My clients paid that. It went up 125 times that, up to $24 million, and it was imposed jointly and severally on people who were making $50,000 or $60,000 a year. And so with respect to those individuals, one can't with a straight face say that that's not in the nature of a penalty. Well, Judge Pro, the first time around used a net gain analysis. Do you see that as the equivalent of disgorgement? Is that the fair measure of what disgorgement should be? I'm sorry. Didn't he use a net gain analysis to come to the $191,000 figure? Well, actually, the first time around what we did was we used three different – our expert used three different tests to try to come up with a measure of disgorgement. And one of those was EBITDA, which is looking at your earnings before interest, tax, and depreciation on something like that. And we maintained that that was the appropriate measure of damages. We argued that again when we went back down on remand, that that was an appropriate measure, because in this circumstance, it's not like – Judge O'Scanlan was involved in – long ago in the Figge case, and you had the – you gave the analogy in there, the difference between if somebody had – thought they were buying a diamond and they were getting another kind of false stone, you're not getting the same thing. These – these consumers knew exactly what they were getting. They were given a panoply, a list of magazines that they could pick from, and they were told that they could even choose to change those over time. They knew exactly what they were getting. And most importantly here – and this goes to the other issue that we're going to be talking about – is proximate causation was a really important issue, and that comes under the Bank of America case. And here, if you go through the chronology of events that actually happened here, you had a series of telephone calls, which itself, you know, at the end, Judge Pro, who wrote the summary judgment opinion, admitted that consumers knew what they were getting at that point. They knew the terms that they were getting. And then there's a lapse between that event and those communications by phone, the rendition of a bill, and then the first invoice that goes out. It's approximately 47 days. So it's not like a situation like Figge, where people were door-to-door salesmen. They're coming into the house, and they're making representations or misrepresentations, and they're inducing people to make a decision there on the spot. These consumers had every chance they wanted to to go ahead and back out of the deal. In fact, the statistics that we put in front of the trial judge demonstrate that a majority of the people didn't follow through on what their decision was and never paid. In fact, Judge Pro focused in on that, which is that there were people here who supposedly were supposed to be protected that were enriched by what went on here. They got free magazines. So, let me, the other issues which I, you know, simply want to talk to you about is, there were disputed issues of fact here, which barred the summary judgment on the alleged Section 5 violations. The new judge, Judge Gordon, who actually ignored the defendant's request for an evidentiary hearing on remand, and even the FTC requested a hearing. We asked one for an evidentiary hearing. He disregarded the proximate cause requirement on the monetary award. And then, most importantly, one of the things that he did here, which is a violation of my client's due process rights, was that he then considered in making his decision affidavits, declarations, which were submitted in support of the motion for summary judgment. When we went in front of Judge Pro, we objected to those coming into evidence. Judge Pro sustained that objection so that they were not in evidence like this. When they went back, the judge, apparently without any notice to anybody, was going to consider that. Now, that was his prerogative, but he had an obligation if he was going to consider evidence, which was the law of the case, that was inadmissible. He had to tell the parties that that was the case. He never did so. We never had a chance to rebut that and to demonstrate to him why he shouldn't be relying on those things. And why? Because there was testimony that was elicited that demonstrated and cast doubt on the credibility of some of those declarants on that. So our last argument that we also were making in why this ought to be reversed is that there is a three-year statute of limitations, which we believe is the law of the case. Now, I understand that there might be some confusion about that, but Judge Pro, in the last sentences of his summary judgment, said that there was a three-year statute of limitations that was applicable. That was what it was supposed to be. The FTC didn't appeal from that issue, never asked for any relief from that. But instead what they did is they went back down to the trial court and asked for about a figure which is calculated on about 4 1⁄2 years like this. We would have taken that up with the judge, the new judge, on something like this. We had asked. That's one of the reasons we asked for an evidentiary hearing. We never got it, never had a chance to rebut that. And if you look carefully at our papers on that, when we submitted in opposition to their effort to get a motion granted on this, we specifically said that there are many problems with these analyses and we want an opportunity to go ahead and elucidate on those things at a hearing itself. Kennedy. If we were to agree with you on the three-year statute of limitations, but nothing else, what would the impact be on the judgment? We believe that that would cut that number probably close to half. I'd have to pull the schedules out on that. And the other element that went into it, which we have a number with specificity is, is that this court on its remand said the trial judge can consider the fact that there were people who renewed or upgraded, added new subscriptions. The judge on remand took the court up on that invitation and removed approximately $10 million of amounts that were people or customers who had actually had reordered or had upgraded in terms of ordering more magazines. However, we made the argument, which is like, look, those people had ordered initially $6.6 million of that. That was their first order, and that ought to be taken off the table as well. And the argument there was, that he made was like, no, this thing was infected from the beginning, and so even though I'm going to set aside the $10 million, I'm not going to set aside the $6.6 million, because he made the assumption without any evidentiary predicate whatsoever that those people were lulled into this and that there was some kind of infection in the process from the beginning. Do you want to save your time? Yes. Thank you. Good morning, Your Honors. Leslie Melman for the Federal Trade Commission. And with me is Faye Chen Barno, Trial Counsel from the Commission's Western Region. Commission sees this case at this juncture quite differently. In our view, the only issue properly before the court is the narrow question whether on remand the district court properly applied the two-step burden shifting framework for calculating monetary equitable relief that the court adopted in its prior decisions, most recently Commerce Planet. Your Honors have inquired about the impact of the Supreme Court's recent decision in Kokesh, so before I go to the issue that's actually before the court, I would like to say a few words. Kokesh has nothing to do with this case. It's a – it's about a statute of limitation, and their counsel has looked to the future and looked for implications in Kokesh, but the court, Supreme Court in footnote three specifically noted that it did not intend to say anything about the availability of equitable relief. It's strictly about a statute of limitations. I should also point out that the way monetary equitable relief and the way the SEC handled that in that particular case is quite different from how the FTC approaches its obligation to consumers under Section 13B of the Federal Trade Commission Act. In the Kokesh case itself, the SEC had already assessed penalties under a different provision and then for the same conduct went back and asked for disgorgement under a different provision. In that context, the court viewed that as a penalty for purposes of the statute of limitations. That's very, very different from how the FTC approaches its obligation to consumers. Various labels have been used by litigants and the courts, but I think it's easiest to see what the FTC does as the monetary equivalent of rescission. It's simply undoing a transaction that has been tainted by fraud. And because it's been tainted by fraud, consumers are entitled to get their money back. In this particular case, consumers were sucked in, I should say, by a lie that was disseminated to them while they were busy at work by phone that they were going to be getting a prize. And that was false. And all the other information that was disclosed to them over the course of three separate conversations while they were busy at work. First they were turned over to a supervisor, then a verifier. Those calls were only partially recorded. So consumers really, really were not, did not know what they were getting into and, in many cases, were completely confused when they received a bill. But if the remedy that the FTC sought is actually rescission, why isn't the argument correct that there should be at least some credit for those who chose not to rescind the transaction, who were perfectly happy with what they got and, in fact, kept it? Doesn't rescission require some affirmative act on the part of the party that wishes to renounce the contract? Well, consumers are entitled to have the transaction undone. Realistically, it's certainly, there hasn't been a windfall for consumers. It's not, they're not practically able to send back many years of old, dusty magazines. So it's not a case where consumers have to return what they received. And this court has recognized that in Figge and in Stefanczyk and in other cases. If somebody is trapped into something, it shouldn't then impose an obligation for them to pay for it. But the consumers got some value here. They got publications that they had subscribed to. They did receive, well, they didn't know what they were getting from the beginning. They thought they were getting a free prize. And to assign value to it would be very unjust. If someone gets a present, they don't know what they have to pay for. Do we have to ignore the magazines that were actually sent and received? Yes, Your Honor. Yes. You have to ignore them. Yes, Your Honor. The court does have to ignore them. And that is the law of this circuit. It's been established in Stefanczyk. It's been established in Commerce Planet. That is a binding circuit precedent. If somebody is tricked, tricked into paying for something, they shouldn't be required to then come up with the money for it. That would be very unjust. It's a factual matter. I understood opposing counsel to say that after a period of time, he said 47 days, the consumer actually chose the magazine. It's not as if you got a magazine that you never specified you wanted. I mean, I suddenly have National Geographic in my mailbox. I never asked for it. Isn't here the consumer actually given a selection of magazines and choosing the one that he or she wants? Well, many consumers didn't get any magazines at all. There were some consumers who were tricked into signing up for additional magazines. However, those consumers, the commission on remand took off that entire group of consumers. That was $10 million. It did not take off, though, the initial sales for the consumers who signed up. Because there's nothing about the, what happened when they signed up again, that suggests that they actually understood the terms of the transaction the first time. And that Isn't it pretty good evidence when they sign up again that they liked what they got the first time? No, Your Honor. Why? Consumers will frequently default to what they are already getting. It doesn't mean, for example, my son might pick up a copy of Sports Illustrated. It's already coming in the mail. It's not what we bargained for. But so I may just default to something that's already set up. That's something that consumers do and that we've seen in many ways. Dissolve the presumption that they relied on the first time? No, Your Honor. I mean, if they continue with the trade? No, Your Honor. To dissolve the presumption under the two-step burden-shifting framework, appellants would have to actually look in a sound, using a sound methodology, and this is also discussed in Commerce Planet, and look at those customers, do a survey of those particular customers. Instead, they looked to consumers in general, not to the consumers who were exposed to the particular series of misrepresentations. We also have to take into account that consumers were threatened throughout this period. They were threatened with threats that their accounts would be turned over to collection. They received letters from a supposed in-house lawyer who actually did not exist. And that threatening abuse of conduct definitely had an impact on consumers and their conduct, whether or not they called to complain, whether or not they called to cancel, because they were getting letters, they were getting calls at their place of work. I would like to say something about the summary judgment decision and the impact of the appellant's failure to appeal that. So in applying the first step of the framework, whether PBS's misrepresentations were widely disseminated, there's no longer a dispute about whether the commission has satisfied the first step. There's no dispute that what resulted from the gross sales was $34 million once refunds and returns were deducted. The FTC voluntarily, in light of the panel's concern in the first appeal, brought that down to 23.7 million. So the panel in the first appeal did not call into question whether the initial orders of those who later renewed were free from the taint of the practices. To the contrary, this court stated that appellants violated Section 5 by, quote, the misrepresentations that launched the process, thus there was no basis in the panel's opinion for excluding the first-time orders for all customers. So then the question really for this court, before the court, is whether Judge Gordon on remand committed error in finding that PBS failed to rebut that presumption. Judge Gordon looked at the economic report that was prepared by Dr. Levy and concluded that it didn't come up with any methodologically sound basis or legally correct basis for making any further reductions. So what the opportunity for PBS on remand was to show whether there was some subset of consumers whose transactions were atypical, who were not misled, and therefore they should be removed from the presumptive amount. The district court found that PBS did not make such a showing. The PBS pointed to a few customers who stated that they were satisfied, but even their testimony did not understand the terms. And more importantly, their testimony cannot be extrapolated to all the consumers as a whole, nor was it proper as a matter of methodology. And Commerce Planet emphasizes, in its opinion, how important it is to have a sound methodology. The economists look to transactions as a whole, not to these transactions, and not to transactions that were tainted by fraud, to make some arbitrary and unexplained assumptions about how many consumers were not misled. Let me ask this. Without the presumption, does the FTC defeat the approximate cause argument? I'm sorry? Does the FTC depend on that presumption to defeat the approximate cause argument? Well, no. There's not a proximate cause issue here at all. What counsel was referring to was private cases, for example, the Bank of America case, which involved an action under the Fair Housing Act, where there were practices, it was redlining, and the question was whether that contributed to, whether it was the proximate cause of a neighborhood decline. Here, there's no question that we have direct cause. We're not concerned about, there could have been many different factors that cause a neighborhood decline in that case. Here, there's no doubt, but that the representation caused the purchase of the magazines. I see my time is almost out. I wanted to just say briefly. You're in the red zone. You've already gone over your time. Thank you very much. Thank you, Your Honor. Let me move through this quickly. I'm serious about there being a separation of powers issue here that the Court has to take into consideration here. What these agencies have done is they've come and asked the courts, and one thing which you should look at is, and I would urge you to read it, read Professor Ward's article where he traces this. It's cited in our brief, and he goes through and he traces the roots of Section 13 and where this restitution type of remedy comes from. And if you look at the chronology here, what you'll see, it doesn't support what the FDC is saying. They came to this court back in 1972 in the Heater case and said, we should be able to get restitution under Section 5. And the court said, nope, can't do that, won't do that like that. They went back to Congress two separate times to try to get additional relief. They first got Section 19, which gives them a right to redress and some other things. And then they said, we need to come back and get a gap filler, Section 13b, which gives them the right to seek conjunctive relief. There's nothing in the legislative history that suggests that they have the power to come in and get these implied remedies. And why I think this is a violation of separation of powers is you've got an agency who doesn't come to Congress and get the relief that they want. And believe me, they've done it. If you go look at the CFTC as an example, they specifically went to Congress and got a right to seek restitution. The FTC has never done that, to my knowledge, and they haven't ever gotten that kind of power specifically. And so what they then do is they come and invite the courts all over the country like this to say, well, let's imply that. And then what they do is they come up with a formulation which requires the courts not to give any consideration to the value which is given. And if you look at the restatement of restitution on this, it specifically says in there, and the Supreme Court cites it with authority in its opinion in Kokesh, which is you're allowed to get offsets for those kinds of things. So in this instance, you would give an equivalent of variable costs and value that's associated with it. If you also mention the $10 million, you're focusing now on the remaining $6 million. Is that where we are? No. I'm focusing on the entirety of this, which is the question about why the methodology that they're using here. You want us to go back to $194,000? Pardon me? You want us to go back to $194,000? We gave three alternative remedies. And when we came back on remand, we also gave three alternative remedies by a different economist. And I think the high number there was around $700,000 on something like that. And they were in there. But we believe that those are established. And under the burden shifting that they're talking about here, it's not our obligation to prove a perfect methodology. It's to come up with a reasonable methodology. And the economist did come up with three reasonable methodologies. And unfortunately, what the trial judge did, went back, didn't tell us that he was going to be looking and relying on affidavits and declarations that were inadmissible and were the law of the case, and came up with these formulas and basically gave the back of the hand to the others. Is it your position that you adequately objected to the declarations? We did, at the trial itself. And Judge Proh said those were not coming into evidence and it's in the record itself in the first trial. And what the judge then, second judge, Gordon, went back and actually considered those things. And he might have had the prerogative to do that. Although law seems to be that when a first judge makes an evidentiary ruling and it goes up and it comes back, it's the law of the case, the second judge can't revisit it. But the problem was he didn't tell us that. And we did ask for an evidentiary hearing. And so we never got that. So that's one of the reasons that there's a due process problem that's associated with this. Let's also talk quickly about this idea that they've got here that, oh, this is so well accepted by everywhere. Take a look at the Supreme Court's decision in the Central Bank case. The issue that they were confronting there was every circuit in the country had recognized aiding and abetting securities law violations under 10b. And the Supreme Court put the rest of that and said, look, we can't avoid that the statute doesn't say this. And we're not going to start implying these remedies, particularly when we're talking about implying an aiding and abetting type of remedy on top of an implied 10b-5 action. So there shouldn't be any hesitancy here by the courts to sit back and understand that the Supreme Court is holding courts now to what the statute says. And this — there's not a word of mention in there about the kind of remedies that they've been seeking here. On this proximate cause issue. Kennedy, I think you've already exceeded your time. Thank you very much. Okay. Thank you.  Submitted.
judges: O'scannlain, Bea, Stearns